IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

MATEUSZ FIJALKOWSKI,         )
     Plaintiff,              )
                                )
       v.                   )       Civil Action No. 1:18-cv-00492
                                )
M. WHEELER, et al.,          )
     Defendants.          )
                                )
                                )

## MEMORANDUM OPINION

This case arises from a somewhat bizarre and nearly tragic set of events. Plaintiff, a citizen and resident of Poland, claims Officers Wheeler, Adcock, Blakely, Bronte-Tinkew, Clark, Grande, Jakowicz, Labarca, McNaught, Mulhern, and Zesk ("the police defendants") are liable for violating plaintiff's Fourteenth and Fourth Amendment rights pursuant to 42 U.S.C. § 1983[1] and for gross negligence under Virginia law. Plaintiff also brings a claim of negligence against defendants Brooks, a lifeguard and plaintiff's former co-worker, and American Pool Inc., plaintiff's former employer ("the pool defendants"). The police defendants and the pool defendants have each moved to dismiss plaintiff's Complaint on a variety of grounds.

At issue on defendants' motions to dismiss are the following questions:

(i) Are the police defendants entitled to qualified immunity with respect to plaintiff's Fourteenth Amendment claim brought pursuant to § 1983?

Put differently, did the police defendants violate plaintiff's "clearly established" substantive due process rights by preventing a lifeguard from taking timely steps to rescue plaintiff from drowning himself?

(ii) Did the police defendants violate plaintiff's substantive due process rights by their own failure to prevent plaintiff from drowning himself?

---

[1] Plaintiff represented in his opposition to the police defendants' motion to dismiss that plaintiff consents to the dismissal of the due process claim alleged in Count II because it is duplicative of Counts I and III, which also allege due process claims. Mem. in Opp. to Mot. to Dismiss Police Defs. at 1 (ECF No. 24).

    (iii) Did the police defendants violate plaintiff's right against unreasonable seizure by failing to prevent plaintiff from drowning himself after securing plaintiff within the fenced-in area around the pool?

    (iv) Did the police defendants' failure to prevent plaintiff from drowning himself constitute gross negligence?

    (v) Does Virginia's workers compensation scheme cover plaintiff's negligence claims against the pool defendants and thus deprive this court of subject matter jurisdiction over that claim?

## I.

The standards that govern a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1), Fed. R. Civ. P., and a motion to dismiss for failure to state a claim under Rule 12(b)(6), Fed. R. Civ. P., are well settled and thus require only brief elaboration.

Pursuant to Rule 12(b)(6), a complaint must be dismissed when the plaintiff fails to state a claim upon which relief can be granted. The district court must examine the face of the complaint and, taking all allegations of fact as true and construing them in the light most favorable to plaintiff, decide whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A party may also seek dismissal of the complaint pursuant to Rule 12(b)(1) on the ground that the court lacks subject matter jurisdiction to decide the claims alleged in the complaint. Similar to a 12(b)(6) motion, the district court must assume the truth of the facts alleged in the complaint and decide whether the complaint alleges facts upon which subject matter jurisdiction can be based.[2] *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

---

[2] The Fourth Circuit has also recognized that a party may attack subject matter jurisdiction pursuant to Rule 12(b)(1) by showing that the jurisdictional allegations of the Complaint are not true. *Adams*, 697 F.2d at 1219. The court may then go beyond the allegations of the Complaint and in an evidentiary hearing determine if there are facts to support the jurisdictional allegations. *Id.* This alternative approach to challenging subject matter jurisdiction is not in issue in this case.

## II.

The following facts are derived from the well-pleaded allegations in the Complaint, which are taken as true for the purposes of a motion to dismiss.[3] *See Papasan v. Allain*, 478 U.S. 265, 283 (1986).

In the spring of 2016, plaintiff signed up for a program that would allow him to work in the United States for the summer. Compl. ¶ 6. Plaintiff obtained employment with defendant American Pool Inc. as a pool attendant at the Riverside Apartments swimming pool in Fairfax County, Virginia. *Id.* ¶¶ 7, 9. On May 23, 2016, plaintiff arrived in the United States, and three days later plaintiff began his employment with defendant American Pool Inc. *Id.* ¶ 9. Defendant American Pool Inc. trained plaintiff to clean the pool, arrange deck chairs, and check the pH level of the water. *Id.* ¶ 10. Plaintiff did not know how to swim, and defendant American Pool Inc. did not require him to perform lifeguarding duties as part of his employment. *Id.* ¶¶ 10, 16.

On May 30, 2016, plaintiff arrived for work at the Riverside Apartments pool. At some point that afternoon, plaintiff experienced a psychotic episode,[4] which was caused by plaintiff's bipolar disorder. *Id.* ¶¶ 2, 13, 53. Plaintiff exhibited irrational behavior, such as arguing with guests over the colored wristbands required for entry into the pool and grabbing one young woman by the arm and ripping off her wristband. *Id.* ¶ 11. Plaintiff began talking to himself in Polish and walking around the pool without purpose and appeared to be emotionally or mentally distressed. *Id.* Defendant Brooks, who was a lifeguard also employed by defendant American Pool Inc.,

---

[3] Additionally, certain facts are also taken from a video recording of part of the May 30, 2016 incident, which the Complaint explicitly incorporates into the Complaint by reference. Compl. ¶ 26; *see also Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (holding that documents that are explicitly incorporated into the Complaint by reference may be considered at the motion to dismiss stage). The video recording of the incident may be viewed at https://www.youtube.com/watch?v=Iv5IuuG-SWo.

[4] Psychosis is defined as "a serious mental illness . . . characterized by defective or lost contact with reality often with hallucinations or delusions." *Psychosis*, MERRIAM-WEBSTER.COM (last visited Feb. 6, 2019).

witnessed plaintiff's behavior and called for police assistance. *Id.* ¶ 12. The police defendants responded to the pool a few minutes later. *Id.* ¶¶ 13, 14.

When the police defendants arrived, the police attempted to communicate with plaintiff several times, but plaintiff did not acknowledge the police defendants. *Id.* ¶ 14. Instead, plaintiff blew a lifeguard whistle and continually moved away from the police defendants. *Id.* After discussing how to proceed, the police defendants directed all pool patrons to leave the pool area and locked the fence that surrounded the pool. *Id.* ¶ 17. The only individuals that remained inside the fenced-in pool area were plaintiff, defendant Brooks, and the police defendants. *Id.* Defendant Brooks informed the police defendants about plaintiff's behavior and told the police defendants that plaintiff was experiencing a psychotic episode. *Id.* ¶ 15. Defendant Brooks also told the police defendants that plaintiff could not swim. *Id.* ¶ 16. According to the Complaint, the police defendants understood that plaintiff's serious mental health crisis and related behavior made plaintiff a potential risk of harm to himself and to others at the pool. *Id.* ¶ 19.

The police defendants called one of plaintiff's Polish roommates and a Polish-speaking police officer to the pool to attempt to communicate with plaintiff, whose English was poor. *Id.* ¶¶ 6, 21, 25. Again, plaintiff would not acknowledge either the Polish-speaking officer or plaintiff's Polish roommate. *Id.* ¶¶ 21, 25.

Plaintiff continued to exhibit unusual and erratic behavior. Plaintiff paced around the pool and continued to talk to himself, apparently praying in Polish. *Id.* ¶ 24. Plaintiff threw his cell phone into the deep end of the pool and then walked into the pool, submerging himself in the deep end, which was eight feet deep. *Id.* ¶¶ 24, 37. After recovering the cell phone, plaintiff emerged from the pool. Plaintiff then threw his cell phone into the deep end of the pool a second time. Again, plaintiff walked into the pool and submerged himself underwater. And again, plaintiff

emerged from the pool after recovering the cell phone. Plaintiff then climbed into a lifeguard tower and shouted and blew his whistle for no reason. The police defendants continued to attempt to communicate with plaintiff, but plaintiff did not respond. *Id.* ¶ 24.

After some period of time, plaintiff finally stood calmly and silently for about one minute near the ladder at the shallow end of the pool. *Id.* ¶¶ 26, 28. Plaintiff then walked slowly to the ladder and entered the water a third time. *Id.* ¶ 28. The police defendants neither ordered plaintiff not to re-enter the pool nor physically prevented plaintiff from re-entering the pool. *Id.* ¶ 27.

Plaintiff again walked into the deep end of the pool and submerged himself underwater. *Id.* ¶¶ 28, 29. Defendant Brooks and the police defendants stood around the pool and watched plaintiff. *Id.* ¶ 30. After some period of time, plaintiff grabbed onto the pool's drain cover underwater in the deep end and struggled not to surface. Plaintiff eventually vomited underwater and then stopped moving. *Id.* ¶ 31. After being underwater for one minute and twenty-two seconds, plaintiff released the air retained in his lungs. The police defendants and defendant Brooks continued to stand around the pool and look at plaintiff underwater. *Id.* ¶ 32. According to the Complaint, the police defendants and defendant Brooks should have recognized that plaintiff was at risk of drowning after plaintiff had been submerged for thirty seconds and had released the air from his lungs. *Id.* ¶¶ 34, 39.

At some point in time unspecified by the Complaint, defendant Brooks expressed that he needed to enter the pool to rescue plaintiff. *Id.* ¶ 40. As a trained lifeguard with access to rescue equipment, defendant Brooks was fully capable of rescuing plaintiff. *Id.* ¶ 41. Nonetheless, one or more of the police defendants ordered defendant Brooks not to enter the pool. *Id.* ¶ 40. Although defendant Brooks did not agree with the police defendants, defendant Brooks obeyed the police defendants' order. *Id.* ¶ 42.

After plaintiff had been submerged for over two and one-half minutes, defendant Brooks again requested permission from the police defendants to dive into the pool and rescue plaintiff. This time the police defendants gave defendant Brooks permission to dive into the pool. *Id.* ¶ 43. Defendant Brooks brought plaintiff's body to the surface, and several of the police defendants removed their belts and jackets and jumped into the pool to help drag plaintiff out of the pool. *Id.* ¶¶ 45, 47. In total, plaintiff had been submerged for two minutes and forty-four seconds. *Id.* ¶ 46.

The police defendants began to perform cardio-pulmonary resuscitation ("CPR") on plaintiff. *Id.* ¶ 47. Emergency medical technicians ("EMTs") arrived about two minutes later and used a ladder to climb over the locked pool fence to reach plaintiff. *Id.* ¶ 48. Upon arrival, the EMTs found that plaintiff was not breathing and did not have a pulse. *Id.* ¶ 49. The EMTs continued CPR and applied an automatic external defibrillator to plaintiff's chest. *Id.* ¶ 50. The EMTs revived plaintiff and transported plaintiff to Fairfax Hospital Emergency Department. *Id.* ¶ 51.

Plaintiff remained in the hospital's Heart and Vascular Institute until June 8, 2016. Thereafter, plaintiff was transferred to the hospital's psychiatric unit, where he was diagnosed with bipolar disorder and was found to have suffered from psychosis, thought disorganization, delusions, and paranoia on May 30, 2016. Plaintiff retained only scattered memories of what had occurred during his psychotic episode. *Id.* ¶ 53. On June 14, 2016, plaintiff was discharged from the hospital and returned to Poland with his father. *Id.* ¶ 54.

Based on these facts, plaintiff has brought suit to recover damages for the physical and mental injury, emotional distress, and medical expenses caused by the conduct allegedly taken by defendants in response to plaintiff's psychotic episode and attempt to drown himself. Specifically, plaintiff claims the police defendants are liable for violating plaintiff's Fourteenth and Fourth

6

Amendment rights pursuant to 42 U.S.C. § 1983 and for gross negligence under Virginia law. Plaintiff also advances claims of negligence under Virginia law against the pool defendants. Defendants seek dismissal of these claims on a variety of grounds, each of which are addressed in turn below.

### III.

In Counts I, III, and IV of the Complaint, plaintiff seeks to recover damages pursuant to 42 U.S.C. § 1983 for alleged violations by the police defendants of plaintiff's right to due process under the Fourteenth Amendment of the United States Constitution and his right against unreasonable seizure under the Fourth Amendment.

Section 1983 provides a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by any person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State." This statute "reflects a congressional judgment that a 'damages remedy against the offending party is a vital component of any scheme for vindicating cherished constitutional guarantees.'" *Gomez v. Toledo*, 446 U.S. 635, 638 (1980) (quoting *Owen v. City of Independence*, 445 U.S. 622, 651 (1980)). Yet importantly, the well-established, judicially-created[5] defense of qualified immunity shields federal and state officials from civil liability under § 1983 "unless their actions violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pinder v. Johnson*, 54 F.3d 1169, 1173 (4th Cir. 1995) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A right

---

[5] The Supreme Court recognized the qualified immunity defense under § 1983 in view of the existence of similar protections from liability afforded to government actors at common law that, as the Supreme Court has explained, "were not abrogated by covert inclusion in the general language of § 1983." *Filarsky v. Delia*, 566 U.S. 377, 383 (2012) (internal quotes omitted); *see also Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993); *Malley v. Briggs*, 475 U.S. 335, 342 (1986) ("[O]ur role is to interpret the intent of Congress in enacting § 1983, not to make a freewheeling policy choice."). *But see Anderson v. Creighton*, 483 U.S. 635, 645 (1987) (stating that the Supreme Court in *Harlow v. Fitzgerald*, 457 U.S. 800, 815–20 (1982), "completely reformulated qualified immunity along principles not at all embodied in the common law").

is "clearly established" if "the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). In other words, there need not be "a case directly on point" for a right to be "clearly established," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). To determine whether the constitutional question is "beyond debate," courts in the Fourth Circuit must look to "cases of controlling authority in [this] jurisdiction, as well as the consensus of cases of persuasive authority from other jurisdictions." *Sims v. Labowitz*, 885 F.3d 254, 262 (4th Cir. 2018).

The well-settled purpose of the qualified immunity defense "is to limit the deleterious effects that the risks of civil liability would otherwise have on the operations of government." *Pinder*, 54 F.3d at 1173 (citing *Anderson*, 483 U.S. at 638). The defense protects society from "the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Torchinsky v. Siwinski*, 942 F.2d 257, 260–61 (4th Cir. 1991). This concern is especially acute in the context of police work, where "decisions must be made in an atmosphere of great uncertainty." *Pinder*, 54 F.3d at 1173. Indeed, the Fourth Circuit has cautioned that "[h]olding police officers liable for every injurious consequence of their actions would paralyze the functions of law enforcement," *id.*, and would severely hamper "the ability of police officers to protect the public." *Torchinsky*, 942 F.2d at 261. Therefore, the qualified immunity defense "allows officials the freedom to exercise fair judgment," *Pinder*, 54 F.3d at 1173, by protecting officers who did not have "fair notice that [their] conduct was unlawful." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

Furthermore, because qualified immunity is "an *immunity from suit* rather than a mere defense to liability," the Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam) (emphasis in original; internal quotes omitted). The Supreme Court has also emphasized that "[c]ourts should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" *Ashcroft*, 563 U.S. at 735. Based on these concerns, the Supreme Court has held that a district court has discretion in a § 1983 case to dismiss the case on the ground that the defendant is shielded by qualified immunity without deciding whether the defendant's conduct actually constituted a violation of the Constitution. *Pearson v. Callahan*, 555 U.S. 223, 237 (2009). This discretion should be guided by "the circumstances in the particular case at hand," including whether the suit "could be disposed of more readily" on the basis of qualified immunity. *Id.* at 236–37.

It is important to note that plaintiff's counsel has argued vigorously that federal courts should abandon or abrogate the qualified immunity defense because it has created a safe haven for government officials to commit constitutional torts and because the doctrine has no historical basis in the common law at the time Congress enacted § 1983. In support of this argument, plaintiff's counsel has submitted a substantial number of law review articles, some of which are quite cogent,[6] that criticize the qualified immunity defense and seek its restriction or abolition. Nonetheless, lower federal courts do not have the authority to abrogate or ignore a judicially-created doctrine sanctioned by the Supreme Court absent a constitutional impediment, which is not present here.

---

[6] *See, e.g.*, Aaron L. Nielson & Christopher J. Walker, *A Qualified Defense of Qualified Immunity*, 93 NOTRE DAME L. REV. 1853 (2018); Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 NOTRE DAME L. REV. 1797 (2018). Also worth mentioning is John C. Jeffries, *What's Wrong with Qualified Immunity?*, 62 FLA. L. REV. 851 (2010), which is especially cogent on this subject.

The analysis thus proceeds on the basis of settled precedent from the Supreme Court, the Fourth Circuit, and other pertinent cases concerning the contours and substance of the qualified immunity defense.

## A.

In Count III, plaintiff claims that the police defendants violated plaintiff's Fourteenth Amendment right to substantive due process under the state-created danger doctrine. Specifically, plaintiff argues that the police defendants substantially enhanced the dangerous situation resulting in plaintiff's injury by ordering defendant Brooks not to enter the pool to rescue plaintiff until plaintiff had been submerged underwater for two and one-half minutes. In response, the police defendants argue (i) that their conduct did not violate plaintiff's due process rights and (ii) that they are protected by qualified immunity.

Because this case presents a close question with respect to the question whether the police defendants' conduct—*i.e.* temporarily delaying a lifeguard from rescuing an individual who is experiencing a psychotic episode from drowning himself—constitutes a due process violation under the state-created danger doctrine, analysis properly begins with the qualified immunity inquiry. *See Ashcroft*, 563 U.S. at 735; *Pearson*, 555 U.S. at 237. The first step, then, is to outline the controlling authority governing the state-created danger doctrine.

The seminal case of *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989), is commonly acknowledged as the genesis of the state-created danger doctrine.[7] In *DeShaney*, the Supreme Court concluded that the Department of Social Services had not violated the plaintiff's substantive due process rights by failing to protect the plaintiff from his father's abuse. *Id.* at 192–

---

[7] *See, e.g., Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001) ("The clear implication of the Court's language, which was written in 1989, was that a state could be liable when it affirmatively acts to create, or increases a plaintiff's vulnerability to, danger from private violence.").

95. This was so, the Supreme Court held, because "[w]hile the State may have been aware of the dangers that [the plaintiff] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.* at 197.

The Fourth Circuit first recognized this state-created danger doctrine in *Pinder v. Johnson*, 54 F.3d 1169, 1176–77 (4th Cir. 1995). In *Pinder*, the Fourth Circuit noted that "[w]hen the state itself creates the dangerous situation that resulted in a victim's injury . . . the state is not merely accused of a failure to act; it becomes much more akin to an actor itself directly causing harm to the injured party" and may accordingly violate the victim's substantive due process rights. *Id.* at 1177. Yet importantly, the Fourth Circuit in *Pinder* held that the state-created doctrine was inapplicable to the facts in that case. There, a police officer, who had assured the plaintiff that her abusive ex-boyfriend would be incarcerated overnight, charged the ex-boyfriend only with minor offenses. Consequently, the ex-boyfriend was not incarcerated overnight but instead was released on his own recognizance and then proceeded immediately to set fire to the plaintiff's house, with her young children still inside, resulting in the death of the children. *Id.* at 1172. On these facts, the Fourth Circuit held that the police officer had not violated the plaintiff's due process rights because "the state did not 'create' the danger, it simply failed to provide adequate protection from it." *Id.* at 1175. This was so, the Fourth Circuit explained, because the state does not "'create[] a danger' every time it does anything that makes injury at the hands of a third party more likely" when "the real 'affirmative act' . . . was committed by [the third party], not by [the State]." *Id.*

Since *Pinder*, the Fourth Circuit has had several occasions to consider due process claims alleging a state-created danger. The Fourth Circuit's recent decision in *Doe v. Rosa*, 795 F.3d 429 (4th Cir. 2015) provided further clarity to the limits of a state actor's liability for due process violations under the state-created danger doctrine. There, the Fourth Circuit held that the state-

created danger doctrine is "narrow" and requires the plaintiff to show (1) that the state actor "created or substantially enhanced the danger" resulting in plaintiff's harm, and (2) that the state actor "did so directly through affirmative acts, not merely through inaction or omission." *Id.* at 439. In that case, the president of The Citadel, a public university, decided not to notify the authorities about allegations made in 2007 that a camp counselor, ReVille, working at The Citadel's youth summer camp had sexually abused campers in 2002. *Id.* at 433–35. Before the allegations were made, a family had invited ReVille to move into their home as a caregiver for their children. Thereafter, ReVille sexually abused the children multiple times a week. *Id.* at 435. Without knowledge of the allegations that the president had failed to report, the family continued to allow ReVille to live with the family, resulting in ReVille's continued abuse of the children for three more months. *Id.* at 435–36. On these facts, the Fourth Circuit concluded that the plaintiffs had not demonstrated a cognizable due process claim under the state-created danger doctrine. *Id.* at 442.

The Fourth Circuit in *Doe* provided three reasons for this holding. First, the president was not liable for the sexual abuse committed by ReVille before the allegations had been made because the State "could not have created a danger that already existed." *Id.* at 439. Second, with respect to the sexual abuse that occurred after the president failed to report the allegations against ReVille, the Fourth Circuit concluded that the children did not "face a new or increased risk of abuse." *Id.* at 440. This was so, the Fourth Circuit explained, because the children were placed in "no worse position than that in which [they] would have been had [the president] not acted at all." *Id.* (quoting *DeShaney*, 489 U.S. at 201). Third, the Fourth Circuit concluded that the plaintiffs had failed to demonstrate that "affirmative acts" by the president had created or increased any danger. *Id.* Rather, the president's failure to report the allegations against ReVille amounted only to inaction;

12

the president "merely failed to take actions that he was under no constitutional obligation to take." *Id.* at 442.

Also instructive on the issue of due process claims under the state-created danger doctrine is *Robinson v. Lioi*, 536 Fed. App'x 340 (4th Cir. 2013, in which the Fourth Circuit concluded, for the first and only time, that the plaintiff in that case had alleged a viable due process violation under the state-created danger doctrine. There, a police officer conspired to prevent the arrest of man who was wanted on assault charges for physically abusing his wife. Specifically, the police officer withheld the arrest warrant from the unit responsible for serving it, sent the man text messages to help the man evade capture, and falsely claimed the arrest warrant could not be found when the man eventually reported to the police headquarters. *Id.* at 341. As a result, the man remained at large and murdered his wife. *Id.* On these facts, the Fourth Circuit concluded that the police officer did not merely fail to act. To the contrary, the police officer had violated the wife's substantive due process rights under the state-created danger doctrine because, by conspiring to prevent the arrest of a man who had violently abused his wife, the police officer committed affirmative acts that directly enabled the man to murder his wife. *Id.* at 344.

The above cases are instructive both for determining the contours of an individual's substantive due process rights under the state-created danger doctrine and for considering whether the due process right that plaintiff claims was violated in the instant case was clearly established at the time of the police defendants' conduct. In the latter respect, plaintiff argues that under the state-created danger doctrine the police defendants violated plaintiff's Fourteenth Amendment right to substantive due process by ordering defendant Brooks, a trained lifeguard, to refrain from rescuing plaintiff from drowning until plaintiff had been submerged for two and one-half minutes. Even assuming, *arguendo*, this constitutes a cognizable due process violation under the state-

created danger doctrine—an assumption that is not without its difficulties[8]—plaintiff's claim must nevertheless be dismissed on the basis of qualified immunity.

As a review of the Supreme Court's and the Fourth Circuit's state-created danger cases reflects, the police defendants did not violate any clearly established substantive due process right enjoyed by plaintiff. As the Fourth Circuit has repeatedly emphasized, the state-created danger doctrine is "narrow." *Doe*, 795 F.3d at 437; *Robinson*, 536 F. App'x at 343–44. Indeed, to date, the only circumstances deemed by the Fourth Circuit to constitute a state-created danger were the facts presented in *Robinson*, 536 F. App'x at 341, 344, in which a police officer actively conspired with a violent man to help him evade arrest, thereby directly creating the opportunity for the man to murder his wife. There is no basis on which to conclude that the Fourth Circuit's ruling in *Robinson* or any of the many cases in which the Fourth Circuit has declined to find a valid claim for a state-created danger were sufficient to bar the police defendants' qualified immunity defense. Put simply, the Supreme Court's and the Fourth Circuit's decisions do not place "beyond debate" and do not give "fair notice" to the police defendants here that it is unlawful under the state-created danger doctrine for a police officer to delay a lifeguard for two and one-half minutes from attempting to rescue a mentally unstable individual from drowning himself. *See Ashcroft*, 563 U.S. at 741; *Brosseau*, 543 U.S. at 198. This is so not simply because the Fourth Circuit has not considered a case factually on all fours with the instant case; rather, this conclusion is also based on the fact that a police officer's efforts to enable a third party to commit a violent act, which

---

[8] In this respect, the Complaint does not allege how long plaintiff had been submerged before defendant Brooks first requested permission to dive in and rescue plaintiff, which the police defendants prohibited him from doing. Depending on how much time had elapsed, plaintiff may have already drowned. Therefore, it is not clear that the police defendants' conduct, namely, preventing defendant Brooks from rescuing plaintiff, "substantially enhanced the danger" that resulted in harm to plaintiff, as is required for a cognizable state created danger claim. *See Doe*, 795 F.3d at 439. But it is unnecessary to reach or decide this issue because for the reasons already stated, it is appropriate here to begin the analysis by determining whether the police defendants are protected by qualified immunity without deciding whether the police defendants' conduct in fact violated plaintiff's substantive due process rights. *See Ashcroft*, 563 U.S. at 735; *Pearson*, 555 U.S. at 237.

constituted a state-created danger in *Robinson*, are of "an entirely different nature" from a police officer's temporary inhibition of a would-be rescuer in an emergency situation involving a person exhibiting psychotic behavior. *See Doe*, 795 F.3d at 442. Thus, because a review of the controlling precedent demonstrates that plaintiff's asserted due process right was not clearly established at the time of the police defendants' conduct, the police defendants are entitled to qualified immunity from plaintiff's due process claim.

Seeking to avoid this conclusion, plaintiff does not meaningfully dispute that the police defendants did not violate any due process right that was clearly established under existing Fourth Circuit precedent. Instead, plaintiff argues that the police defendants' alleged conduct was so egregious that no precedent was necessary to give the police defendants fair notice that their conduct was unlawful and violative of plaintiff's rights. To be sure, the Fourth Circuit has recognized that "when the defendants' conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts that the action was unconstitutional, closely analogous pre-existing case law is not required to show that the law is clearly established." *Clem v. Corbeau*, 284 F.3d 543, 553 (4th Cir. 2002) (internal quotes omitted).[9] In this respect, the Seventh Circuit has persuasively held that a reasonable police officer would know, even without factually apposite precedent, that a fundamental protection guaranteed by an individual's right to substantive due process is that "the state cannot arbitrarily assert its power so as to cut short a person's life." *Ross v. United States*, 910 F.2d 1422, 1433 (7th Cir. 1990). The question, then, is whether the police defendants' alleged conduct exhibited such

---

[9] Judge Posner expressed this point in typically lucid fashion when he observed that "[t]here has never been a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages liability because no previous case had found liability in those circumstances." *K.H. Through Murphy v. Morgan*, 914 F.2d 846, 851 (7th Cir. 1990).

arbitrary disregard toward plaintiff's life that a reasonable officer in the police defendants' shoes would have known without guidance from the courts that the conduct was unconstitutional.

In this respect, the facts alleged in the Complaint demonstrate that the police defendants' conduct was not so patently arbitrary and violative of plaintiff's due process rights that a reasonable official would have known that it was unconstitutional. According to the Complaint, the police defendants observed that plaintiff had twice walked to the deep end of the pool where he fully submerged himself for a period of time before safely emerging from the deep end and exiting the pool of his own accord. Moreover, prior to plaintiff's attempt to drown himself, the police defendants were aware that plaintiff was mentally unstable and that plaintiff had taken a series of bizarre and aggressive actions, including grabbing a young woman by the arm, arguing with pool patrons, throwing his cell phone into the pool, shouting at the police, and otherwise exhibiting a total lack of responsiveness to efforts by the police defendants and other crisis intervention personnel to communicate with him. Indeed, according to the Complaint, the police were aware that plaintiff's psychotic episode made plaintiff "a potential risk of harm to himself and others at the pool." Compl. ¶ 19. For these reasons, there was a sufficient basis on which the police defendants could rationally conclude that it was neither safe nor necessary for defendant Brooks to attempt to rescue plaintiff during the period of time that the police defendants ordered defendant Brooks not to enter the pool.

Therefore, in view of the circumstances confronting the police defendants, it is appropriate to conclude that the police defendants' conduct, namely ordering a lifeguard not to enter the pool to rescue plaintiff from drowning himself until plaintiff had been submerged for two and one-half minutes, was not so irrational or taken with such disregard toward plaintiff's safety that a reasonable police officer would have known such conduct violated plaintiff's constitutional rights.

To the contrary, the police defendants might reasonably have decided that to allow the lifeguard to enter the pool at the time of the first request would have endangered the lifeguard and plaintiff and that it was appropriate to wait to see if plaintiff would emerge from the pool voluntarily as he had done twice before.

Importantly, this is not to say that the police defendants' decision to inhibit the lifeguard for as long as they did was prudent or correct. Yet, as the Sixth Circuit has persuasively stated, "public safety officials should have broad authority to decide when civilian participation in rescue efforts is unwarranted. If police officials are not satisfied that would-be rescuers are equipped to make a viable rescue attempt . . . it would certainly be permissible to forbid such an attempt." *Beck v. Haik*, 234 F.3d 1267 at *4 (6th Cir. 2000). Thus, for the reasons already stated, it would be inappropriate to conclude, based on the facts alleged in the Complaint, that the police defendants' actions were so egregious as to deny qualified immunity to those defendants in the absence of clear guidance from controlling precedent.

Furthermore, the case on which plaintiff chiefly relies in support of his argument to the contrary, *Ross v. United States*, 910 F.2d 1422 (7th Cir. 1990), is distinguishable and thus neither controlling nor persuasive authority in the instant case. In *Ross*, a twelve-year old boy fell into a lake and sank. *Id.* at 1424. Ten minutes later, two lifeguards, two firefighters, and one police officer arrived on the scene with equipment to conduct a rescue. *Id.* In addition, two civilians with a boat and scuba-diving equipment offered to assist in the rescue. *Id.* Yet, despite the presence of abundant rescue personnel and equipment on-scene, the county deputy sheriff ordered the persons present at the lake to cease all rescue efforts because, pursuant to a county policy, only divers from the city fire department were authorized to rescue someone drowning in the lake. *Id.* at 1424–25. Moreover, the deputy sheriff threatened to arrest anyone who entered the water and positioned his

17

own boat to prevent the two civilian divers from diving into the lake. *Id.* at 1425. Authorized city divers did not arrive at the lake and retrieve the boy's body until the boy had been underwater for thirty minutes, twenty minutes after the initial, non-authorized rescuers arrived at the scene. *Id.* On these facts, the Seventh Circuit concluded that the deputy sheriff was not entitled to qualified immunity on the plaintiff's due process claim despite the lack of apposite precedent because "[t]here was simply no rational reason for [the deputy sheriff] to prefer 'authorized' but equally competent rescuers located away from the scene." *Id.* at 1433.

*Ross* is distinguishable from the facts in the instant case in two key respects. First, unlike *Ross*, where the deputy sheriff obstructed private rescue efforts for twenty minutes and no rescue was conducted until the boy had been underwater for thirty minutes, the police defendants here prevented defendant Brooks from entering the pool at most for only two and one-half minutes.[10] This substantial difference in time is significant because delaying private rescue efforts for a relatively brief period of time is far less indicative of a disregard for the safety of the drowning individual and may be necessary to enable public safety officials to assess an uncertain emergency situation before exercising their discretion to allow civilians to attempt a rescue. Second, and more importantly, for the reasons already stated, the police defendants here, unlike the deputy sheriff in *Ross*, had an ample basis on which to conclude that it was neither safe nor necessary for defendant Brooks to attempt to rescue plaintiff for at least some period of time. Again, this is not to say that the police defendants correctly judged the necessary amount of time by which to delay defendant Brooks's rescue efforts; indeed, in hindsight it appears that the police defendants may have waited

_____

[10] As noted previously, the Complaint does not specify how much time elapsed between defendant Brooks's first request for permission to attempt to rescue plaintiff, which the police defendants denied, and his second request to do so, which the police defendants granted. In any event, even if defendant Brooks's made his first request immediately after plaintiff submerged himself in the pool, the total amount of time by which the police defendants delayed defendant Brook's rescue attempt would be at most less than three minutes, which is substantially less than the twenty-minutes by which the deputy sheriff in *Ross* delayed rescue.

too long. But unlike the deputy sheriff in *Ross*, the police defendants had adequate, rational reasons to support their decision to prevent defendant Brooks from entering the pool for a brief period of time. Therefore, *Ross* is inapposite and does not compel the conclusion that the police defendants' conduct was sufficiently arbitrary such that a reasonable police officer in their shoes would have known the conduct was clearly unconstitutional.

Accordingly, the police defendants are entitled to the defense of qualified immunity to plaintiff's state-created danger due process claim.

**B.**

In Count I, plaintiff claims that the police defendants also violated plaintiff's substantive due process rights by failing to prevent plaintiff to enter into the pool while suffering a mental health episode. This argument fails because plaintiff was not in police custody at the time plaintiff harmed himself.

In *DeShaney*, 489 U.S. at 196, the Supreme Court held that "the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." Yet, an exception to this rule is that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 199–200. For example, the State is required to ensure the reasonable safety of incarcerated prisoners, involuntarily committed mental patients, and children who have been involuntarily removed from their homes and placed in state-approved foster care. *Id.* at 198–99; *Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 176 (4th Cir. 2010). In other words, a person is in the government's "custody," for purposes of due process analysis, when "the State by the affirmative exercise of its

power so restrains an individual's liberty that it renders him unable to care for himself." *DeShaney*, 489 U.S. at 200.

Under *DeShaney*, it is clear that plaintiff was not in the "custody" of the State when plaintiff submerged himself in the pool. It is true, as plaintiff highlights, that the police defendants had locked the fence surrounding the pool area and had removed all civilians from the pool area. But these facts do not demonstrate that the police defendants here "so restrain[ed] [plaintiff's] liberty that it render[ed] [plaintiff] unable to care for himself." *DeShaney*, 489 U.S. at 200. Simply put, the restraint imposed on plaintiff's liberty by the police defendants was minimal; temporarily locking the fence around the pool lounge area did not rise to the level of "remov[ing] [plaintiff] from free society . . . analogous to incarceration or institutionalization." *Id.* at 201 n.9. Moreover, it is plainly apparent that plaintiff's own psychotic symptoms, and not the police defendants' affirmative conduct, rendered plaintiff unable to care for himself. Thus, because plaintiff had not been taken into state custody, plaintiff's substantive due process claim based on the police defendants' failure to protect plaintiff from drowning himself fails.

## C.

Plaintiff next claims in Count IV that the police defendants violated plaintiff's Fourth Amendment right against unreasonable seizure by failing to detain plaintiff and instead allowing plaintiff to drown himself. This claim fails because plaintiff was not seized by the police defendants.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend IV. A "seizure" occurs when an officer restrains the liberty of a citizen by means of physical force or

a show of authority to which the citizen yields. *California v. Hodari D.*, 499 U.S. 621, 625–26 (1991).

Because plaintiff's Complaint does not allege that the police defendants applied any physical force to plaintiff, the Complaint must allege that plaintiff submitted to a show of authority by the police defendants. Assuming, *arguendo*, that the police defendants' conduct—locking the pool area fence, removing other civilians from the area, and attempting to communicate with plaintiff—constitutes a show of authority, it is clear that plaintiff did not yield. The police defendants made several attempts to communicate with plaintiff, and, in response, plaintiff ignored the police defendants and continued to walk away from the police defendants. Although it may be true that a reasonable person would not have felt free to leave under the circumstances present here, this fact is not dispositive. *Id.* at 627–28. Because plaintiff, who was experiencing a psychotic episode and exhibiting erratic behavior, did not yield to a show of authority by the police defendants, no seizure occurred. Therefore, as the police defendants did not seize plaintiff, plaintiff's Fourth Amendment claim fails.

## IV.

Count V alleges a claim of gross negligence under Virginia common law against the police defendants for failing to prevent plaintiff from harming himself. This claim fails because the alleged actions taken by the police defendants in response to plaintiff's erratic behavior and submersion in the deep end of the pool do not amount to indifference or complete neglect of plaintiff's safety.[11]

---

[11] The police defendants also argue that plaintiff's gross negligence claim is barred because "a party who consents to and participates in an immoral or illegal act cannot recover damages from other participants for the consequences of that act." *Zysk v. Zysk*, 239 Va. 32, 34 (1990). In this respect, the Supreme Court of Virginia has held that a plaintiff who commits suicide is barred from bringing a civil action for damages arising from plaintiff's suicide because suicide is an illegal act. *Wackwitz v. Roy*, 244 Va. 60, 65–66 (1992). Yet, the Supreme Court of Virginia also observed that to commit the common law crime of suicide, a person must be "of sound mind" when he takes his own

Virginia law defines gross negligence as "a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person." *Cowan v. Hospice Support Care, Inc.*, 268 Va. 482, 487 (2004). Because "'the standard for gross negligence [in Virginia] is one of indifference, not inadequacy,' a claim for gross negligence must fail as a matter of law when the evidence shows that the defendants exercised some degree of care." *Elliott v. Carter*, 292 Va. 618, 622 (2016) (quoting *Kuykendall v. Young Life*, 261 Fed. App'x 480, 491 (4th Cir. 2008)).

Here, the allegations in the Complaint demonstrate that the police defendants exercised some degree of care to prevent plaintiff from harming himself in response to plaintiff's psychotic episode and attempt to drown himself. Specifically, the Complaint alleges that after the police arrived at the Riverside Apartments pool, they took the following steps: (i) they attempted to communicate with plaintiff by calling to the scene crisis intervention-trained officers and a Polish-speaking officer; (ii) they monitored plaintiff during the entire time they were on the scene; (iii) they jumped into the pool to help defendant Brooks bring plaintiff above water and out of the pool; and (iv) they performed CPR after plaintiff was removed from the pool. Together, these actions clearly demonstrate that the police defendants exercised some care in assisting plaintiff and that the police defendants were not completely indifferent or neglectful with respect to plaintiff's safety. Indeed, distilled to its essence, plaintiff argues that the police defendants were grossly negligent not because they did nothing to rescue plaintiff, but because they waited too long to rescue plaintiff. This argument fails because, as the Supreme Court of Virginia has made clear,

life. *Id.* at 65. In the instant case, it appears from the allegations in the Complaint that plaintiff was not of sound mind when he submerged himself in the deep end of the pool and struggled to avoid surfacing. Specifically, the Complaint alleges that plaintiff was suffering from psychosis and delusions and thus was not in touch with reality when he attempted to drown himself. Thus, assuming the truth of the factual allegations in the Complaint, it appears that plaintiff did not commit the crime of attempted suicide and thus is not barred from bringing his tort claims. In any event, it is unnecessary to reach or decide this issue because, as explained above, the Complaint's allegations are insufficient to demonstrate that the police defendants were grossly negligent.

"the standard for gross negligence [in Virginia] is one of indifference, not inadequacy." *Id.* Thus, because the facts alleged in the Complaint establish that police the defendants exercised some degree of diligence and care in response to plaintiff's psychotic episode and attempted self-drowning, plaintiff's gross negligence claim fails to state a claim and must be dismissed.[12]

## V.

Finally, Counts VI and VII of the Complaint allege claims of negligence against the pool defendants on the ground that defendant Brooks allegedly abided by directions from the police defendants and failed to take steps to rescue plaintiff from drowning until plaintiff had been submerged for over two and one-half minutes. In response, the pool defendants argue that this court lacks jurisdiction over plaintiff's negligence claim because plaintiff's rights under the Virginia Workers Compensation Act ("the VWCA")[13] constitute plaintiff's sole remedy for defendant Brooks's allegedly negligent failure to prevent plaintiff from drowning himself at the Riverside Apartments pool on May 30, 2016.[14]

The VWCA provides the exclusive remedy for all claims by an employee against an employer or fellow employee[15] for any injury that "is the result of an accident and arises out of

---

[12] This conclusion finds further support in two additional facts alleged by the Complaint. First, plaintiff had twice walked to the deep end of the pool where he fully submerged himself for a period of time before safely emerging from the deep end and exiting the pool of his own accord. Second, before plaintiff attempted to drown himself, he had exhibited a series of bizarre and aggressive actions. Indeed, the Complaint specifically alleges that plaintiff's psychotic episode made plaintiff "a potential risk of harm to himself and others at the pool." *See* Compl. ¶ 19. These facts further weaken plaintiff's argument that the police defendants' delay in removing plaintiff from the water, alone, is sufficient to demonstrate that the police defendant were indifferent to plaintiff's safety because there were ample reasons to believe, at least for some period of time, that plaintiff needed no assistance and that it was not safe to attempt to remove plaintiff from the pool.

[13] Va. Code §§ 65.2-100 to 65.2-1310 (2017).

[14] The Fourth Circuit has made clear that it is appropriate to raise an exclusive remedy defense under the Virginia Workers Compensation Act pursuant to a motion to dismiss for lack of jurisdiction under Rule 12(b)(1). *Scott v. CG Belkor, LLC*, 711 Fed. App'x 158, 159–60 (4th Cir. 2018) (per curiam); *Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647–50 (4th Cir. 1999).

[15] The VWCA's exclusive remedy provision does not extend to claims brought by an employee against a "stranger to the business" of the plaintiff's employer. *Rasnick v. Pittston Co.*, 237 Va. 658, 663 (1989). In the instant case, the

and in the course of the employment." Va. Code §§ 65.2-101 & 65.2-307; *Combs v. Virginia Elec. & Power Co.*, 259 Va. 503, 508 (2000). Accordingly, if the injury alleged in Counts VI and VII was "(1) an injury by accident, (2) arising out of, (3) and in the course of, [plaintiff's] employment," relief under the VWCA constitutes plaintiff's exclusive remedy for such injury, and plaintiff's negligence claims must therefore be dismissed. *Combs*, 259 Va. at 508.[16]

An "injury by accident" is an injury (i) that "appeared suddenly at a particular time and place and upon a particular occasion," (ii) that "was caused by an identifiable incident or sudden precipitating event," and (iii) that "resulted in an obvious mechanical or structural change in the human body." *S. Exp. v. Green*, 257 Va. 181, 187 (1999). Each of these factors is satisfied here because the injury that plaintiff allegedly suffered was a near drowning and cardio-pulmonary arrest caused by defendant Brooks's alleged failure to rescue plaintiff in a timely manner. The particular time, place, and occasion of this injury was at the Riverside Apartments pool on May 30, 2016 during the two to three minutes that elapsed from the time plaintiff submerged himself in the deep end of the pool until the time defendant Brooks eventually entered the pool to rescue plaintiff. The identifiable, precipitating event that caused plaintiff's injury was defendant Brooks's allegedly negligent failure to prevent plaintiff from drowning himself in a timely manner. And as a result of plaintiff's injury, *i.e.* the cardio-pulmonary arrest plaintiff suffered as a result of nearly drowning, plaintiff's body experienced a mechanical or structural change in the form of an inability

---

parties do not contend that either of the pool defendants—defendant Brooks and defendant American Pool Inc.—were strangers to the business of defendant American Pool Inc.

[16] Plaintiff devotes much of his argument to a discussion of whether plaintiff's bipolar disease and the psychosis plaintiff experienced on May 30, 2016 qualify as "occupational diseases" that are compensable under § 65.2-400 of the VWCA. This discussion misses the mark. The Complaint does not allege, and the pool defendants do not contend, that plaintiff's bipolar disease or the related psychotic manifestations of the disease are the injuries for which plaintiff seeks to recover via his negligence claims. Rather, the injuries alleged by plaintiff in the Complaint are plaintiff's near drowning and cardio-pulmonary arrest. Accordingly, the correct inquiry under the VWCA is whether these alleged injuries were injuries "by accident arising out of and in the course of the employment." Va. Code § 65.2-101.

24

to breathe or to circulate blood. Accordingly, it is clear that the injury for which Counts VI and VII seek relief constitutes an "injury by accident."

To constitute an injury arising out of the plaintiff's employment, "the employment must expose the employee to the particular danger causing the injury, notwithstanding the public's exposure generally to similar risks."[17] *Combs*, 259 Va. at 510. Put another way, an injury "arises out of the employment when there is a causal connection between the claimant's injury and the conditions under which the employer requires the work to be performed." *United Parcel Serv. of Am. v. Fetterman*, 230 Va. 257, 258 (1985). These principles, applied here, point persuasively to the conclusion that plaintiff's injury arose from his employment. Plaintiff's position as a pool attendant entailed duties such as cleaning the pool, arranging deck chairs around the pool, and checking the pH level of the water in the pool. Each of these responsibilities required plaintiff to work in close proximity to the pool. Thus, plaintiff's employment plainly exposed plaintiff to the danger of drowning in the pool and the danger that the on-duty lifeguard might fail to take adequate steps to rescue plaintiff from drowning. And it is clear that these workplace conditions bear a "causal connection" to the injury suffered by plaintiff on May 30, 2016. *See United Parcel Serv. of Am.*, 230 Va. at 258. Therefore, plaintiff's injury arose out of his employment.

Finally, it is well-settled that an injury occurs "in the course of the employment" if the injury occurs (1) "within the period of the employment," (2) "at a place where the employee may reasonably be," (3) "and while he is reasonably fulfilling duties of his employment or engaged in doing something incidental thereto." *Combs*, 259 Va. at 511 (citing *Bradshaw v. Aronovitch*, 170

---

[17] Indeed, it is well-established under Virginia law that it is not necessary to show, for purposes of satisfying the arising out of element, that the employee was exposed to a risk to which a member of the public in his same position would not also have been exposed. *See Immer & Co. v. Brosnahan*, 207 Va. 720, 725 (1967). Thus, plaintiff's argument that the injury did not arise out of employment because the events would have unfolded in the same way even if plaintiff had been a member of the public and not an employee of American Pool Inc. fails.

Va. 329, 385 (1938)). It is clear—and the parties do not dispute—that the first two factors are satisfied here because plaintiff's injury occurred during his shift and in proximity to the pool that plaintiff was responsible for maintaining. Yet, whether plaintiff's injury occurred while he was fulfilling duties of his employment or while he was doing something incidental to those duties is a significantly closer question. Virginia courts have held that an employee's conduct at the time of an injury is incidental to his employment duties if that conduct is "reasonably connected to the fulfillment of employment duties"; it is not necessary to show that plaintiff's conduct was safe or otherwise reasonable. *Town & Country Animal Hosp. v. Deardorff*, No. 0047-08-4, 2008 WL 2338602, at *4 (Va. Ct. App. June 10, 2008) (citing *Tyree v. Commonwealth*, 164 Va. 218, 223 (1935)). The question then is whether plaintiff's erratic, irrational, psychotic behavior occurring in temporal proximity to plaintiff's injury was reasonably connected to the fulfillment of plaintiff's employment duties.

In this respect, the Supreme Court of Virginia's decision in *Combs v. Virginia Elec. & Power Co.*, 259 Va. 503 (2000), is instructive. In that case, Combs, an employee of Virginia Power, participated in an aerobics class at Virginia Power's office during the lunch hour. *Id.* at 506. During the class, Combs began to experience a severe headache stemming from an unknown, pre-existing aneurysm. *Id.* at 506–07. In response, an employee from Virginia Power's Employee Health Services brought Combs to the "quiet room," a room used by ill and recuperating employees, to rest. *Id.* at 506. Combs remained in the "quiet room" for two hours before any employee from Employee Health Services checked on Combs. *Id.* When an Employee Health Services employee finally did check on Combs, Combs had vomited on herself and was in a coma-like state. *Id.* Combs then brought suit against Virginia Power, claiming that the negligent medical care provided by her co-workers exacerbated her pre-existing aneurysm. *Id.* at 506–08. After concluding that Combs's

injury constituted an accident that arose out of her employment, the Supreme Court of Virginia determined that Combs's injury also occurred in the course of her employment. This was so, the *Combs* Court held, because Combs was injured at a place where she was reasonably expected to be while engaged in an activity reasonably incidental to her employment by Virginia Power, namely temporarily deviating from work activities while she experienced her aneurysm-related migraine in Virginia Power's "quiet room." *Id.* at 511–512.

The facts of *Combs* are closely apposite to the facts of the instant case and thus compel the same conclusion. Like the plaintiff in *Combs*, plaintiff here was at work performing his work-related tasks before he began to experience symptoms of his pre-existing bipolar condition. Plaintiff's symptoms manifested themselves in the form of a psychotic episode, in which plaintiff experienced delusions, exhibited a variety of erratic behavior, including submerging himself in the pool, and later retained only partial memories of what had occurred. It was during this psychotic episode that defendant Brooks failed to rescue plaintiff from the pool until after plaintiff had been underwater for almost three minutes. Thus, similar to the plaintiff in *Combs*, plaintiff here was injured by a co-worker while plaintiff had temporarily deviated from the performance of his assigned duties due to the sudden onset of the debilitating symptoms of his bipolar condition. To be sure, those symptoms involved a series of bizarre actions by plaintiff, which would not ordinarily constitute the fulfillment of plaintiff's assigned duties. Yet, as recognized by the Supreme Court of Virginia in *Combs*, an employee's temporary deviation from his assigned tasks, stemming from the sudden onset of the symptoms of a pre-existing illness, is reasonably incidental to the performance of the employee's duties. Thus, plaintiff's injury occurred in the course of his employment because defendant Brooks failed to rescue plaintiff from the pool while plaintiff was doing something reasonably incidental to his work-related tasks, namely temporarily deviating

27

from the performance of his assigned duties owing to the sudden onset of the symptoms of his bipolar condition.

In sum, the injuries plaintiff claims he suffered as a result of the pool defendants' allegedly negligent rescue efforts were nearly drowning and experiencing cardio-pulmonary arrest. Those injuries were injuries by accident, arising out of, and in the course of plaintiff's employment. Therefore, the VWCA constitutes the exclusive remedy for plaintiff's negligence claims against the pool defendants, and Counts VI and VII must be dismissed for lack of jurisdiction.

## VI.

For the reasons stated above, the police defendants' motion to dismiss for failure to state a claim and the pool defendants' motion to dismiss for lack of jurisdiction must both be granted, and all Counts of the Complaint must be dismissed.

An appropriate Order will issue.

Alexandria, Virginia
February 12, 2019

/s/

T. S. Ellis, III
United States District Judge